Good afternoon, Your Honors. Joshua Bachrach. I represent the appellants in this case. I'd like to reserve three minutes of time for rebuttal. This lawsuit involves the denial of claims for reimbursement by Spencer Recovery, a drug and alcohol detoxification center. Spencer is licensed to provide non-medical services to people who have already undergone primary detoxification. The district court in this case found that the denial of benefits under ERISA was an abuse of discretion and entered judgment in favor of Spencer. The problem is, Your Honors, that the court never reached the central issue, which is whether, under the terms of this plan, this treatment that it offered was covered, whether it was even licensed to provide this treatment, which it was not. Now, this isn't like a disability case, where, you know, there are issues that are, at times it's never clear whether the person is disabled, especially at times when a plan has granted benefits and then takes it away. This issue is black and white. Either this treatment is covered or not. So the conflict of interest really is not as important in a case like this. And in this case, this treatment clearly is not covered. To be eligible for reimbursement, this has to be medically necessary treatment services. Now, how can treatment be medically necessary when they're not licensed to provide medical treatment? The State issued a license to Spencer, and that license is for non-medical services. And when you look up under the California Code of Regulations what it means to provide medical services versus non-medical, when you prescribe medication, that's medical detox. In both cases, a doctor, a medical doctor prescribed medication to each of the underlying claimants. There was a doctor affiliated with the hospital? I don't have in front of me the billing came from Spencer, not from a separate doctor. Right. But it's undisputed that there was a doctor who was affiliated with the clinic that did prescribe medication while they were at the centers, right? Which is not allowed to prescribe. That center is not allowed to provide those types of services. So they have a doctor who is. A medical doctor is allowed to in an appropriate facility. This isn't an appropriate facility. Because this facility, again, let's look at Laguna Beach permit. This is a, this is allowed to provide a residential program for people who have already gone through a medical detox program. That's in our record excerpts at 2, 5, 6, 4. Show me, I think that would be more important. Because the district court did quote the coverage provision and concluded that it was covered. But if we could just look at the coverage, the relevant coverage provision, and maybe you could show us in the language why you think it's not covered. Well, there are two reasons. Your Honor, I apologize. I didn't bring the entire record excerpt with me. I can provide you with it at some point if counsel has it. I did not bring those pages with me, and I apologize for that. I didn't bring the thousands of pages. I have your policy here. What's your problem here? Well, Your Honor, the problem is twofold. One is that they're not, the services provided at Spencer. Spencer is only allowed to provide non-residential programs for those who have already gone through a primary detox. Instead, they are providing the primary detox for Mr. Youngblood and Mr. Morita. They didn't go anywhere before they came here. This was a primary treatment. And they're not allowed to do that under their license and under the permit from the community. The basis of the denial of the benefits to the administrator? The denial is that this place isn't – there are a few reasons, Your Honor. What did the administrator say when he denied the benefits? That the treatment was not medically necessary and that it was not a facility that was covered to provide the types of services. And with respect to whether the facility is licensed, Your Honor, again, this is supposed to be – well, let me take a step back. Medically necessary includes two things. One is you have to be permitted to provide the service. It's Spencer, not Dr. Maps, who billed my clients. And Spencer is not allowed to do it. Spencer puts on a bill under Spencer Recovery Hospital. Well, it's not a hospital. It's not licensed to be a hospital. And then it bills out for the Librium. It's Spencer who billed the Librium, not Dr. Maps. And Spencer is the one who does not have a license to dispense medication. And they bill that to my client fraudulently, saying, we're billing you for acute inpatient care. But they're not allowed to do that. And counsel comes up and says, well, that was a mistake. We used some old billing paper. Nonsense, because they had to input the billing codes on there. But Your Honor, both of them – But they did give the care, right? Excuse me? They did give the care. They gave substandard care. Okay, so this goes to really one of my fundamental issues, even though I would love to see the coverage terms, since this is a coverage case. And this actually happened to me. I had something wrong with my finger. I went to the urgent care in Santa Barbara, because I was visiting up there. And the urgent care medical doctor said, your finger is not broken. I won't even X-ray it. Here's some painkillers, and sent me away. Well, my finger still hurt, and I thought, this is weird. I think it's broken. I even said that to the doctor. I think my finger is broken. I think you should give me an X-ray. No, no, no, unneeded, not broken. So when I got home, went to my regular doctor. Doctor X-rays it, and it's broken. My insurance company covered both. They paid both the bill for emergent care, which I would argue, especially since they subsequently admitted it, provided malpractice instead of care. So it was inadequate care. And they paid for the doctor who actually did a correct diagnosis and put a splint on my finger. No big deal. So my finger is a little deformed as a result of this. But what I'm saying is, my insurance company didn't say, oh, the care they gave you at urgent care was inadequate, and it was the wrong diagnosis, and therefore it wasn't medically necessary, so we're not going to pay for it. They just paid for it. They didn't even look into it. And they had both records. They had both the documents from the first diagnosis and the documents from the second doctor. So they knew I had gone to two different doctors for the same thing, which ordinarily you'd think they would object to that, but they didn't. So that's exactly what I think you're doing here. You're saying we're not going to just look at whether the treatment was provided, especially in a situation where these people, there's no dispute that they were both recovering alcoholics and in serious trouble. Treatment was provided. You cover that treatment. But you come back, your investigator in particular comes back and says, oh, but it was substandard because they weren't even licensed for it, so therefore we don't have to pay. So the poor victim of this is the one who ends up, had they not signed the agreement with Spencer, who would end up paying. That's precisely the point, Your Honor. They've got a great scam going on here, Your Honor. You don't have to pass a cent. We'll bill your insurance company. Don't say they've got a great scam going on here. Your Honor, I don't have to. The State of California is that. People with conflicts of interest. Your Honor, the State. Isn't that a scam? No, Your Honor. Well, at times it can be. At times it can be, Your Honor. And at times you're right. At times insurance companies. So don't go criticizing somebody else. All right, Your Honor, I won't. I will cite to you what the State of. I will tell you what the State of California has said. The State of California has said that Spencer was cited for failing to. Distinguish the situation of a doctor who is borderline malpractice and that claim submitted from the situation here. I will, Your Honor. Counsel will agree with me. The language here says that the treatment must be medically necessary. That's the language in both places. But can you argue that the situation of the doctor who committed malpractice, that the treatment itself wasn't medically. Your Honor. That some treatment was medically necessary. Some treatment was medically necessary, right? This claim was submitted through the State of California's Department of Insurance Independent Medical Review Program. We didn't pick the doctor. They didn't pick the doctor. The Department of Insurance picked the doctor to review what went on here. And that doctor said the treatment was so substandard that it was not medically necessary. That there was no detox logs weren't filled in for most of the time. Okay, so slow down just for a sec. Sure. Isn't there a difference between treatment that's medically necessary versus inadequate treatment? I mean, treatment can be medically necessary. You've got to have broken something. That there's a misdiagnosis. This isn't a misdiagnosis, Your Honor. That's what distinguishes. This is a lack of the treatment that you're billing for, for which they've been cited to by the State of California numerous times. This is them not filling out. Well, what about all the people who go to urgent care and are getting substandard treatment and they don't even realize it? Are their claims not covered? Your Honor, if they're getting substandard care, if the treatment is actually being done that they say is being done, then it's covered. But here, the State of California, even apart from this claim, has said they bill for services that they've never provided. They billed us for providing rehabilitation services, A, that they're not licensed to provide, but, B, they didn't prepare detox logs, which they're required to do. Mr. Youngblood was seen one time after he was in there by a doctor. Mr. Youngblood, the treatment he received was primarily in group therapy, but even that was sparse. Basically, this was a residential facility that didn't provide any treatment whatsoever. That's the problem, Your Honor. At least your doctor looked at you. And I'm sorry that the doctor didn't provide the right care. No, no. It's just an analogy. I know. I could have made it up. But here, this doctor didn't do anything. This facility didn't do anything. They did. They actually did something. It's just you don't think they're – you think it was – didn't they arrange for a doctor to treat him? They gave him some pills, and he was in this residence away from alcohol for a period of time with care given, provided to him by people at the facility. No, Your Honor. In fact, Spencer's been cited for having drugs on the facility. We're talking about this particular claim. In this particular claim, well, there are two of them. For Mr. Youngblood, they fly him into Texas. He goes through the program. He gets minimal treatment. And, again, the State's own – the Department of Insurance independent doctor said that this was so inadequate that it's not medically necessary. And even the – a person from the Department of Insurance said, how can it be medically necessary when you're not even licensed to provide it? Which, again, Spencer submitted these bills, not the doctor. And Spencer, as a facility, can't provide this treatment. But the fact is, Your Honor – Well, what is all-med physician review? All-med physician review? Well, there are a few reviews that went on. Some were internal. And then there was the IMR review. If you – the name of the doctors, for example, there was an in-house doctor who reviewed the claim. That doesn't answer who. All-med physician review, it says in the findings, was first selected by Jeklak to review the Morita claim. Well, here's what happened. After this independent medical review came out, and Spencer could have asked for a re-review. They complained about it, and they could have asked for a re-review. They didn't. Instead, they went and they submitted limited documents to another doctor and asked that doctor for a report, without telling that doctor that Spencer wasn't licensed to provide those medical services. So they rely on that report from all-med. But then when all-med found out that they weren't licensed to provide these services, when they received all the information, all-med took that report back. Okay. So here are the findings of the district court that you have to show are clearly erroneous. Okay. She said the plan provides benefits for treatment of substance abuse, and that they must be pre-certified, which in both cases, they were pre-certified over the phone. Well, not for a time. Only for a limited number of days, Your Honor. Let's not quibble with the little things. Let's try to show. I'm asking. I'm trying to build a question here so that I can understand your position as to why you think what the district court did was clearly erroneous, right? Okay. So wait. So finding number eight, charges incurred at a specialty hospital are a covered expense. The plan also covers charges incurred at a chemical dependency treatment center. Then she finds that Spencer Recovery Centers are both. Now, why is she wrong? Because to be considered a specialty hospital, you have to provide diagnostic and therapeutic services. You have to be able to provide diagnostic and therapeutic services. And Spencer did not do that. You also have to, Your Honor, under the language, you have to have the continuous supervision of a doctor. That's the language in the plan. And they didn't. They had a doctor, a medical director. Actually, they had multiple medical directors. But the medical director, we were told, was only there on an as-needed basis. And what we found out was that the person was never there, virtually never there. At the entire time that Mr. Youngblood was in there, he was there exactly one time. So that's not continuous supervision of a doctor. So you're saying, okay, so you're saying that Spencer Hospitals was not a recovery center, was not primarily engaged in providing diagnostic and therapeutic services. Correct. And so how is that defined in the policy? Diagnostic and therapeutic services? Right. I don't believe those specific terms are. So you have to give them their plain and ordinary meaning. Do they provide diagnoses? Your Honor, this goes back to square one. They can't. They're not allowed to provide medical services. They have a license to provide nonmedical treatment. So what's the ordinary meaning of therapeutic? Therapeutic would be, you know, I think part of the problem is if it's diagnostic, they lose. Therapeutic, if they were providing therapy sessions, that could be considered that. But that's not what went on here. They offered minimal therapy to these people. All right. But the more important part, Your Honor, as I mentioned, is that they, every bill, everything came from Spencer Recovery Hospital. That's literally what it said on paper. So are you saying if the insureds had submitted these claims directly, you would have covered them? I'm saying that they probably would have received the same review standard, because you don't treat anything differently. And, in fact, Spencer stepped into the shoes of them. No, I understand. Okay. So you're saying you would have denied coverage to Mr. Youngblood and to the other insured? Mr. Morita, under the terms of the contract, because this was not medically necessary, this was a facility that wasn't licensed to provide this treatment. So the decision would have been the same. But when you see a history of the same conduct, you know, the medical director, Dr. Matz, who was involved with this, he was involved with this other facility, Paracelsus, which settled a million-dollar fraud claim involving numerous insurance companies over the same exact thing that went on here. They advertised resort-like places. They'd fly people in like they flew Mr. Youngblood in from Texas to receive treatment. And then what happened to Mr. Youngblood? His treatment ended. They dropped him. They didn't fly him home. They left him on the street. And then he comes back in because he relapsed, obviously. But that's just another billing opportunity now for them. Okay. So what is the error of the district court? Well, Your Honor, the error is, well, we feel it's many. But the bills, the services were provided by Spencer Recovery, Inc., or Spencer Recovery Hospital, as they bill themselves. Spencer Recovery is not licensed to provide these services. And so if they're not licensed, how can it be medically necessary? They could be. You're not saying, just because they're not licensed, they could have provided the services. They could have provided residential halfway house-like services. But would that have been covered under the policy only if it fits the other requirements? Well, where does it say in your policy that they have to be licensed? Where does it say that they have to be licensed? Well, Your Honor, it says that it has to be a hospital, and it defines hospital. A rehabilitation hospital defines it, or a specialty hospital. And again, it defines that. And Spencer doesn't fit into that. Where does it define it? Where? Right within the policy after those definitions. And I can provide that to Your Honor later. But as I said, for a specialty hospital, which they're now saying they are, it has to be under the constant or continuous supervision of a doctor, which it wasn't. And they have to provide diagnostic and therapeutic treatment. But they're not allowed to provide diagnostic treatment under their license. And again, don't take my word for this, Your Honor. I mean, you look at the State of California. I'm trying to look in your insurance. I'm trying to see if there's coverage. I understand that, Your Honor. But how is this different, Your Honor, than the case that we cite to with an auto repair facility which didn't give an estimate which was required under the law? And the Court said for public policy, if you don't follow the law, you can't recover. Here we're not dealing with a car. We're dealing with vulnerable, sick people. And what you have here is a facility that is billing for things that they're not allowed to do. And it's that simple. Their license does not permit them to dispense medication. They dispense Librium to both people. Their license doesn't permit them to be a hospital. And yet they're billing out my client as a hospital. They're billing for inpatient acute care. They're billing for monitoring patients when the records show that they didn't anyway. But they're billing for medical monitoring, which they're not allowed to do. And the only way to stop them from doing things that the State of California has said you can't do is to not let them recover their bills. What should these two patients have done? What should these two patients have done? I take it they had a substance abuse problem. And they needed detox and they needed to be in probably a 12-step type program. What should they have done? They needed to go through a primary detox center. A primary detox is one where you have 24-hour doctors. You know, there are too many of those darn shows, and I don't watch them, which go through rehabs and show you what rehab places are like. But they have a doctor there that's there 24 hours. They have nursing staff there. They have individual therapy. They have group therapy. And that's what these are. Is that in the policy? Would that have been covered under the policy? No. Is that in the policy that you have to go to this place with 24-hour doctors? Yeah. Your Honor, yes. The specialty hospital. Read me the tributes. It's in the definitions of, well, first of all, it's under medically necessary treatment that the person submitting the bill or the entity submitting the bill must submit for medically necessary. But if they're not licensed, how can it be medically necessary? But aside from that, I understand. Well, I'm looking at it from the point of view of the person who's ill. And so the person that's ill goes to a facility, believes it's a facility that can help them, and goes through their program and incurs a bill. And let's say the person paid the bill, and now they're looking for reimbursement. That's not the issue here, Your Honor. I know what that's like. But you said you would treat them. Wait a second. This is what kind of might turn the case for me. You said you would have treated the claim that had been submitted by the insured the same. The same way. The same way. So that's why it's the same. And you're right, Your Honor. It would have been treated the same. And what they would have said is, okay, is this medically necessary treatment? Who is the facility? And my client even asked Spencer, give us your license. Let's see what your license allows you to do. Forget about Spencer. Let's say, you know, he went to a place and the place wasn't licensed. Under the policy, it wouldn't be covered. And I can provide you, when I get back, I will send you the language in the policy that covers it. I can't paraphrase it here right now, Your Honor, but I can tell you if they're providing services that are not licensed, there's a specific provision in the policy that governs that. That says what? That says that they must be licensed to provide those services. And I will provide you with that, Your Honor. I see physical therapy has to be licensed. I don't see that physician or surgeon has to be licensed. The hospital has to be licensed. The facility that's claiming it has to be licensed to provide those services. It sure would be helpful if you had your policy. Well, I apologize for that, Your Honor. I'm not sure if counsel does, but I will. And you have to have a doctor there all the time, Your Honor. You have to have the continuous supervision of a doctor to be a specialty hospital. The doctor's got to be there. Does he have to be there? Continuous supervision? I don't know. I think that might actually be too harsh, to be honest, Your Honor. But they have to be available. They have to be. Somebody has to be. Continuous supervision to me means they're looking at the medical records. They're charting. They're making notes on the charts. They're examining them. And none of that happened here. You know, there was one examination for Mr. Youngblood. There was no record that the doctor ever reviewed the records at any other time. So there's none of that, Your Honor. This is a facility that went way beyond what it was supposed to do. But the worst part, as Your Honor's pointing out, it did so poorly. And you have Mr. Youngblood, who relapsed and had to go back in for treatment. And I'm not sure whether that was successful. I can't answer that. But we also know Mr. Marina, by the time this happened. But someone who goes through, who's an alcoholic or who's a drug addict relapses. That's not unusual. It's not unusual at all, Your Honor. But that's why they need the proper care. And they weren't getting it. The State's own doctor, and this is the important part for me, is the Department of Insurance picked a doctor, an independent medical review. And this independent medical review doctor said this treatment is so substandard, it's nonexistent, that it cannot be considered medically necessary. Therefore, the claim should be denied. That was the independent medical review. We're talking now, we're looking at the patient. We're just looking, and you said you treat the hospital just like the patient. All right. The patient goes in there. The patient believes that this is a facility that provides detox services and that will help this patient, this person, be able to deal with the alcoholism, the disease that this patient is suffering from. And it turns out they don't have a license and they don't have a doctor that comes by. So you would just deny, and the client or the patient pays the bill, seeks reimbursement. All in good faith. Reimbursement, you're telling me, would be denied. I would say that reimbursement would probably be denied, and we would recommend to that person that they seek, they hire a lawyer to get their money back. I can also tell you there are times, by the way, where my client will advance pay facilities if they know that they're providing legitimate care. All right. I did your job for you. So I found specialty hospital. It says, too, it is licensed by the state in which it operates. Now, as I understand it, Spencer has a license. It's just not a license. It's a license for something narrower than what your coverage. It's a license to provide, right, to provide nonmedical services. Right. But it is licensed. Your Honor. This doesn't describe what. Your Honor, it doesn't define what, but I would think it's obvious. You know, implicit in it that it's licensed to provide the services that it's providing. Well. A butcher may need a license, but it doesn't mean that they can offer, you know, open up as a butcher shop. Anyway, so maybe all this is irrelevant because what the district court really held was that your investigation was procedurally irregular and that you had a conflict of interest. You gave a number of conflicting explanations throughout the process. Well, if I may address that, Your Honor. Well, that's what the district court found. I know. And the district court in that regard was incorrect in finding that we gave different reasons because the district court, remember, remanded the claims at one point. And it remanded it for us to develop both sides, to develop evidence on medically necessary so that it could decide the issue of medical necessity. So the court knew that medical necessity was the issue, and that was the basis for the final denial. So when counsel says that it was a different reason, that's not true. The district court knew that we denied it on it, and that was one of the issues that needed to be developed. Well, that's a different issue than that they weren't licensed. Well, no, Your Honor, because even the State, Mr. Signolari from the State of California came back and said it's hard to conclude how a facility can provide medically necessary services when they're not licensed to provide them. That's from the State of California Department of Insurance. But the investigation also, and I had a lot of problem with the judge saying we investigated too hard. What did we ask for? Ms. Cutter asked for a copy of their license. So she knew what they were allowed to be doing, and Spencer never provided it. So that obviously sends off some red flags. She also knew that Dr. Maps was involved as the medical director of Paracelsus, which had this fraud issue a few years earlier, and he's the medical director there. So that sends off red flags. So I don't know how you – but here's the other thing. At every step of the way, they said to Mr. McEwen and previously to his clients, provide us with the information, just provide us with the information. And they never did. And then they blame us. In fact, even during the remand, there's this detailed letter from Mr. McGuire to Mr. McEwen saying we're supposed to be jointly working on this stuff, to provide the court with all this information. And his response was, I'm not doing your job. You provide it. And then he got mad because the IMR report comes back bad for him. He got mad because the state of California rejected his arguments against the IMR report. And he tried to submit his own report, which was then pulled back from that facility, all men. So here's the other thing, Your Honor. And I'm sure the Court's aware of the Montour decision that came out a few weeks ago from the Ninth Circuit, which discusses conflicts of interest. A conflict of interest, as the Supreme Court said in MetLife, is a factor to consider. But in a case where you're dealing with coverage, and it's either covered or it's not, a conflict of interest can't create coverage. I'm not saying my client did anything bad or that's worthy of saying this was bad, this is evidence of a huge conflict. But even if it did, that can't create coverage. It's different than in the Montour case where, again, I mentioned earlier, it's a disability case where benefits were paid for a while, and then the Social Security awarded benefits, and then the client all of a sudden comes back and says you're not disabled. Well, you have to think that may be, and they didn't even have an IME. Well, yeah, you scratch your head over that. That does sound like a conflict. But this is, you take the facts, you take the policy language, if it's not covered, a conflict can't make it covered. It's just not covered. And that's what we have here, Your Honors. And I say I'm well over time, and I thank you. It's an interesting case. It is. All right. And the coverage question is still not clear to me exactly what you're arguing. But maybe just drop a note with the portions of the record you want us to look at. I will, Your Honor. Thank you very much. Good morning, Your Honors. Mike McKeon with the Special Court Coverage Center. First, as to this licensing issue, I should mention that Judge Marshall found this to be exactly what it was, just another post hoc rationale. That was the latest in a whole parade of excuses. I want to speak up so we can hear you. I'm sorry. I'm just saying that the licensing issue that they raise is the most recent issue over an eight-year period that they've been taking shots at Spencer Recovery Centers. First, they accused it of inadequate care. When that one really didn't fly, they threw in this licensing argument of theirs at the last second. Not even at the last second. The administrative record had closed at that point in time. We were out of remand status. We were back before the district court. And they quickly issue a letter by a land of gamash stating that we find that your facility is not properly licensed. Well, it is properly licensed. They make a big deal out of the fact that Spencer dispensed or administered the drug Librium as part of its detox program. Spencer is allowed to do that as part of a medically managed residential detox program. Spencer does not prescribe the medication. The doctor prescribes the medication. And the patient self-dispenses the medications under observation by the staff. And their own doctor, their own medical expert said that there was nothing wrong with that. And the patient self-dispenses? Yes, under observation. What do you mean under observation? Well, under supervision. Who keeps the pills? I think the medications are locked away. But the patient actually does self-dispense the med to himself. What does that mean? He goes up to the window, gets his pill. I've never been there during the detox program, Your Honor. But my understanding is that the California Department of Alcohol and Drug Programs has made a distinction between what they call medically monitored detox where the meds are dispensed by a physician and medically managed residential detox where the patients self-dispense their own meds or prescribed by a medical doctor. And Spencer most certainly is licensed. Nobody's going to give the patient the pills and tell the patient, take one of these every six hours. It doesn't work that way. Well, like I said, I've never been present. Well, maybe you better look around. Go to one of those. I'll give you a good recommendation. I may need one by the end of this case, Your Honor. But their expert, their medical expert, Dr. Robert Smith, told them eight years ago that there was nothing wrong with the way that Spencer handled medications at his facility. In his report of August 29, 2001, which is at ER 1598 and 1599, he acknowledged that Librium was dispensed as part of Spencer's detox program. And he also went on to explain that in a detox program like Spencer's, the patient would, quote, self-dispense his own medications under observation. Those are the words. What they mean is, you see, I know a little bit about this because I've established in this area five homeless shelters. We had about 3,000 people. Salvation Army runs some. Some are run by the VA. And what they do, the patient, they take their meds and they keep them in a locked-up room. And then at certain times of the day, they make sure the patient comes. They give the patient some water. And they watch the patient put the pill in their mouth. That sounds. Take the water. That sounds. They do. Yes, Your Honor. That sounds like what Spencer does as part of a medically managed detoxification program. I don't know what Spencer does. Well, I can only base what I know on what's in the administrative record. And, really, it is true that the record was not well developed on this issue because the issue wasn't even raised until we were deep into litigation. They didn't raise this licensing issue until we were out of remand status and back before the district court. There really wasn't any opportunity to raise it or to develop evidence along those lines because up until that point in time, their only objection to Spencer Recovery Centers centered on alleged inadequacy of care. So we were centered on that issue. And then, lo and behold, they bring this licensing issue. Do you know whether there's a requirement for coverage in the contract? It says it has to be a facility qualified to dispense medical care. I'm sorry, Your Honor? I said the coverage in the contract. Is it only for medical facilities? Nothing limits that I'm aware of in the policy coverage to just medical facilities. Depending, again, on how you define a medical facility. Spencer is a non-medical facility. Well, I said you don't have to know much about how you define it if you know that Spencer's a non-medical facility. Is coverage limited to medical facilities? To my knowledge, coverage is not limited to medical facilities. Well, have you researched it? You've been on this eight years. I've read the same policy that we've looked at as part of the administrative record. Usually with these cases, the insurance cases, if you get all these briefs and laws and you look at the policy, then you can answer the question. Well, the policy defines a chemical dependency. Stick around for the next case. All you do is look at the policy. It tells you the answer. Well, the policy defines a rehabilitation hospital and the Youngblood policy defines a chemical dependency treatment center. And, for example, a chemical dependency treatment center, clearly Spencer meets all the qualifications of that, and the Youngblood policy says that the definition of a hospital shall include a chemical dependency treatment center. So by its own terms, Spencer would be a hospital, but it's not a hospital. So their policy is a little vague in that regard. As far as the definition of a rehabilitation hospital, I would submit that that's vague. But nobody brought that up as a reason for denying the claim either. But you don't have the policy, would you? I don't. Neither of the lawyers came with the policy, and that's the key thing. I'm sorry, Your Honor? Well, maybe it isn't the key thing. Maybe we're missing something in thinking the policy language is important because this is all about what the administrator did. Well, if they had raised that as a ground for denial, Your Honor, that Spencer was not eligible under the policy, I think we'd have a different case and in a different court. I think we'd be in State court, not Federal, because then we'd have an action for misrepresentation because before Spencer admitted either one of these patients, it first called and verified the availability of benefits. It was told that it had to then contact the medical administrator, PHCS, private health care management services, to obtain certification for admission. It did all that. And then after it obtained the pre-certifications for admission, it admitted the patients to its facility. Now, if GE Financial or GBLAC had come in later and said, excuse me, but you don't meet our policy definition of an eligible facility, I think we'd have a different lawsuit. They didn't bring that up until late in the litigation. Okay, anything else? I did want to just comment very briefly on a couple of points that were raised by their reply brief as to this allegation about Dr. Krzyzewski and him having retracted his opinion. Actually, they're more careful. They say that it was retracted by the reviewing agency. They don't say he retracted his opinion. And in order to support this, they quote from two reports that are not even in the administrative record. These were appended to a declaration of defense counsel that was filed in opposition to my fee motion five months after the trial. So not only are they trying to retry their case on appeal, but they want to do it based on evidence that wasn't even before the district court at the time of trial. As far as the reports themselves, it's not clear who wrote them. They signed off on by Dr. Skip Friedman, who's the medical director for Almed. If, indeed, he did write them. But didn't Almed say that the treatment was covered? Yes, in an earlier report by a different physician. Dr. Richard Smith is also affiliated with Almed. These are reports that they went out and obtained actually six months before trial. But they wisely chose not to use them at trial because if they had, I think that would have been the utmost conflict of interest because by that point in time, they'd already cut off all access to the records and said we're not going to look at any more medical reports. We don't care what you send us. We'll send it back to you for the Youngblood case. But then what did they do? They went right out and got additional medical reports, which they now seek to rely upon on appeal. They never used them at trial. Well, the whole thing sounds pretty odd. I don't know if we can clear it up at oral argument or whether we should just submit it at this point. All right. I think we understand your position. Do you have something else you want to tell us? There was one. Just one more thing. At pages 25 and 26 of their reply, they say that when I obtained the Kruszewski review, that I never told the people at Almed that Spencer was not licensed to provide medical treatment, and I would invite the Court's attention to my letter of November 22, 2005, to Almed at ER 2164 and 65, where I clearly spelled out that Spencer was licensed only for non-medical services. I even underlined the word non-medical in my letter, so I don't know if it would have been any clearer than what I was. All right. Thank you. We'll give you a minute, huh, because you're way, way over time. You're more generous. I was not even going to the doctor's appointment. What did you say? I was not even going to ask since I had taken so much time. All right. Your Honor, as I understand it, I thank you for your time. Okay. Thank you very much. Yeah. All right. We'll call the next case or the final case.
judges: Pregerson, Reinhardt, Wardlaw, Graber, Gould